**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

BROADCAST MUSIC, INC.,

                Petitioner,

      v.

SIRIUS XM RADIO LLC f/k/a SIRIUS XM
RADIO INC.,

                Respondent.

Civ. No. 24-6896

Related to *United States v. Broadcast Music, Inc.*, 64 Civ. 3787 (LLS)

---

### PETITION OF BROADCAST MUSIC, INC. FOR AN ORDER CONFIRMING THE REASONABLENESS OF BMI'S RATE QUOTE, OR ALTERNATIVELY, <u>TO SET REASONABLE FINAL LICENSE FEES</u>

1.      Broadcast Music, Inc. ("<u>BMI</u>") is a performing rights organization that licenses the public performance right in the United States of the more than 22.4 million songs and musical compositions in its repertoire.

2.      BMI operates pursuant to a Consent Decree.[1]  Article XIV(A) of the Consent Decree requires BMI to quote music users what BMI deems to be reasonable fees and terms for requested licenses.  If BMI and a music user are unable to agree on license fees and terms, either party can petition this Court to evaluate the reasonableness of BMI's rate quote and, if necessary, set the reasonable fee and terms.

3.      On May 8, 2023, BMI quoted to Sirius XM Radio LLC (f/k/a Sirius XM Radio Inc.) ("<u>SiriusXM</u>") the fee and principal terms BMI deemed reasonable for a BMI license for the period

---

[1] BMI's Consent Decree (the "<u>Consent Decree</u>") refers to the Final Judgment entered in *United States v. Broad. Music, Inc.*, 1966 Trade Cas. (CCH) ¶ 71,941 (S.D.N.Y. 1966), as *amended* by 1996-1 Trade Cas. ¶ 71,378 (S.D.N.Y. 1994).  A copy of the Consent Decree is attached hereto as Exhibit A.

January 1, 2022 through December 31, 2026 (the "Rate Quote").[2]  The parties have been unable to agree to final terms.  BMI submits this Petition for a determination that the rates it quoted for the license requested by SiriusXM are reasonable or, in the alternative, for an order setting reasonable rates for SiriusXM's public performance of songs in the BMI repertoire.[3]

### Introduction

4.    Almost every aspect of our lives is accompanied by a soundtrack—from commercial radio, to live concerts, to bowling alleys and fitness clubs, to background music at the mall or in a restaurant.  This almost ubiquitous use of music presents logistical problems for songwriters and music users alike.

5.    Copyright law grants songwriters, composers and music publishers control of the right to publicly perform the works they author or acquire.  Music users, accordingly, need permission, by way of a license, to publicly perform copyrighted music or they risk statutory infringement penalties for the unauthorized use of each work.

6.    It would be virtually impossible for large music users, like SiriusXM, to monitor and transact with the individual copyright owner(s) of each song or music catalog.  Likewise, it would be virtually impossible for individual copyright owners to monitor and transact with the hundreds of thousands of businesses and establishments in the United States that publicly perform music.

7.    The existence of BMI and the other domestic performing rights organizations ("PROs") solves this problem.  Individual songwriters, composers and music publishers contract

---

[2] The specific terms of the Rate Quote, including the rate, are competitively sensitive, and thus omitted from this filing.  BMI has reserved the right to modify the Rate Quote based upon additional market information.

[3] The collection of songs for which BMI licenses the public performance right is referred to as its "Repertoire."

with BMI (or another PRO) which, in turn, licenses music users and collects fees for the public performance right in the songs in its Repertoire.  BMI then distributes royalties to its affiliated songwriters, composers and music publishers.  In this way, BMI increases the availability of music to those licensees that want to use it, reduces transaction costs, and ensures that composers and music publishers are fairly compensated for the use of their works.

8.      To maximize the benefits of licensing with BMI, music users (including SiriusXM) typically elect to take what is called a "blanket license."

9.      A blanket license grants music users the public performance right in all the works in the BMI Repertoire for the license period—including new works added to the BMI Repertoire during the term of the license—in exchange for license fees.  Through blanket licenses from BMI and the other major PROs, music users like SiriusXM can perform an unlimited number of works an unlimited number of times during the license period without the need to identify and pre-clear individual works.[4]  SiriusXM and its program producers, disc jockeys and hosts receive immediate access to all works, including new works in the BMI Repertoire as soon as they are written, allowing them to offer creative and spontaneous programming, such as playing listener requests or the latest hits, without the need to pre-clear each individual right.

10.      This blanket protection, and the flexibility it affords, is incredibly valuable.  As the Supreme Court recognized in explaining the benefits that PROs like BMI provide to music users, "[m]ost users want unplanned, rapid, and indemnified access to any and all of the repertory of compositions."  *Broad. Music, Inc. v. Columbia Broad. Sys., Inc.*, 441 U.S. 1, 20-21 (1979). Blanket license fees are generally set as a flat fee or percentage of the user's revenue.  Once

---

[4] Each of the four domestic PROs offers a blanket license for all of the rights in their repertoire, so a music user with blanket licenses from all four PROs can publicly perform any music it wishes without worrying about whether a particular right has been licensed.

established, the typical blanket license fee does not vary based on the amount of music used during the license period.

11.     BMI is almost always able to negotiate license fees that are acceptable to the music user.  In the rare instance where, as here, BMI and a music user are unable to agree on a license fee, the BMI Consent Decree provides a mechanism for petitioning this Court to evaluate the reasonableness of the quoted fee and, if necessary, set a reasonable fee.

### The Parties and Relevant Non-Parties

### A.  Broadcast Music, Inc.

12.     BMI is a Delaware corporation with its principal place of business located at 7 World Trade Center, 250 Greenwich Street, New York, New York 10007.

13.     BMI is one of four domestic PROs.  The other three are the American Society of Composers, Authors, and Publishers ("ASCAP"), SESAC, Inc. ("SESAC"), and Global Music Rights ("GMR").  Each songwriter is affiliated with only one PRO at any particular time. Together, and through agreements with performing rights societies around the world, the four domestic PROs, in the aggregate, represent the public performance rights in virtually all the copyright-protected songs performed in the United States.

14.     BMI has approximately 1.4 million songwriter, composer, and music publisher affiliates (collectively, BMI's "Affiliates"). BMI contracts with its Affiliates for the right (non-exclusive within the United States), to license the public performance of their songs.  Notable BMI Affiliates include the writers of some of the world's most famous songs.  BMI Affiliates also include many songwriters who are not (or are not yet) household names and who are often the talent behind the songs performed by stars.

15.     BMI licenses the right of public performance in the songs in its Repertoire to music users for a fee.

16.     BMI tracks the public performances of songs in its Repertoire and uses that information to distribute license fees collected (less certain deductions) to its Affiliates as royalties, ensuring that they are fairly compensated for the public performance of their works.

17.     BMI also protects the rights of its Affiliates by bringing claims against unlicensed music users for unauthorized use of songs in the BMI Repertoire.

**B.  SiriusXM**

18.     SiriusXM is a Delaware corporation with its principal place of business located at 1221 Avenue of the Americas, 35th Floor, New York, NY 10020.  It was formed in 2008 through the merger of Sirius Satellite Radio Inc. and XM Satellite Radio Inc.

19.     SiriusXM is a wholly-owned subsidiary of Sirius XM Holdings Inc. ("Sirius"), which primarily operates the satellite radio arm of Sirius's business.

20.     Sirius is an audio broadcasting company with multiple lines of business, the most prominent of which is SiriusXM.[5]  SiriusXM plays audio in cars, on other consumer electronic equipment, and on SiriusXM's mobile app (the "SXM App").

21.     SiriusXM's offerings are commonly known as satellite radio.  SiriusXM satellite stations are also available via digital streaming.  SiriusXM also offers many digital streaming-only stations.

22.     SiriusXM's satellite radio and streaming offerings are available to customers on a subscription basis.  As of December 31, 2023, SiriusXM had approximately 33.9 million subscribers.

---

[5] Sirius also owns Pandora Media, LLC, which operates the online music service Pandora.  Pandora operates pursuant to a separate license with BMI that is not at issue in this proceeding.  Sirius acquired the podcast platform Stitcher in July 2020 and, until recently, operated it through Pandora. As of August 2023, Stitcher has been discontinued and Sirius has announced plans to incorporate its podcast offerings as part of the SiriusXM satellite radio subscription.  BMI understands that the Stitcher podcasts are also not covered by the license at issue in this proceeding.

23.    SiriusXM's stated vision is "to shape the future of audio where everyone is effortlessly connected to the voices, stories and music they love."  SiriusXM features its music offerings prominently in its advertising and financial reporting.  The company's 2023 10-K states that SiriusXM "offer[s] a dynamic programming lineup of commercial-free music plus sports, entertainment, comedy, talk, and news."  The home page of SiriusXM's website features a photograph of a live musical performance at SiriusXM's "Small Stage Series" and says subscribers can get three months of SiriusXM for $1 and "[e]njoy ad-free music across all genres and decades . . . ."  Another promotion on the page uses the slogan "Music That Makes You Sing Out Loud" and promotes "ad-free music," and "exclusive in-studio performances."

24.    SiriusXM has in the past entered into license agreements with BMI to secure the public performance rights in BMI's Repertoire, which allows SiriusXM to publicly perform songs from the BMI Repertoire as part of its satellite radio programming and digital streaming services.

### C.  Other Relevant Non-Parties

25.    BMI and ASCAP are the largest domestic PROs, and collectively represent the rights to the vast majority of the songs performed by SiriusXM.  SESAC is a PRO that has operated since the 1930s.  GMR is a relatively new PRO, founded in 2013.[6]

26.    Like BMI, ASCAP operates under a consent decree, which is known as "AFJ2." While not identical, BMI's Consent Decree and AFJ2 are materially similar in all respects relevant to this matter.

27.    Unlike BMI and ASCAP, SESAC and GMR are not subject to consent decrees.

---

[6] GMR represents a small but high-profile roster of affiliates, containing approximately 161] songwriters, many of whom are household names.  Although some GMR songwriters were previously affiliated with BMI, the majority were previously affiliated with ASCAP.

## Jurisdiction and Venue

28.    Jurisdiction is proper in this Court pursuant to this Court's rate-setting authority under Article XIV of the Consent Decree.  More than ninety days have elapsed since BMI advised SiriusXM of the Rate Quote, and the parties have been unable to agree on a license.

29.    This Court has personal jurisdiction over SiriusXM as a result of SiriusXM's request for a license pursuant to the Consent Decree, which requires rate court petitions to be filed in this District.  Venue is proper in this District on the same basis.

## Relevant Background

### A.  The BMI Consent Decree, Mandatory Licensing and Rate Court

30.    BMI was founded in 1939 by television and radio broadcasters, who were large music users seeking to create a new PRO to compete against the then-dominant ASCAP.  Those music users recognized the benefit of PROs to their business, and successfully established a choice among PROs for songwriters.

31.    BMI has never been found to have violated the antitrust laws, yet since 1941 it has been subject to the Consent Decree that was put in place to resolve a lawsuit brought by the United States Department of Justice ("DOJ").

32.    BMI has never been found to have violated the Consent Decree.

33.    In 1964, despite the existence of the original Consent Decree, the DOJ (at ASCAP's urging) brought an antitrust lawsuit against BMI in an effort to force BMI's broadcaster shareholders to divest their BMI stock.  A 1966 DOJ memorandum described the 1941 action as a "'friendly' suit, since [it] occurred during ASCAP's heyday," and explained that "the Department supposedly did everything possible to insure [*sic*] BMI's success against the monopolistic ASCAP."  The memo went on to describe the lack of evidence supporting the antitrust claims

asserted against BMI in the 1964 suit and recommended settling the litigation.  The litigation was settled and a new version of the Consent Decree was put in place.

34.    In 1994, at BMI's request, the Consent Decree was amended to add a rate court provision—embodied in Article XIV of the Consent Decree—much like one that had existed in ASCAP's Consent Decree for decades.  Article XIV has three primary features: (1) automatic licensing, which provides that as soon as a music user asks for a license, it is automatically licensed and has the right to publicly perform all works in the BMI Repertoire; (2) interim rate-setting, which provides a mechanism for judicial determination of an interim rate that is to be paid while the final rate is negotiated and/or litigated, subject to retroactive adjustment; and (3) final rate-setting through the rate court, which is a mechanism for the judicial resolution of rate disputes between BMI and a music user.

35.    The automatic-licensing provision takes away BMI's ability to say "no" to a music user in a negotiation; users instantly have access to BMI's full repertoire, and BMI's only recourse against a music user unwilling to pay a fee that BMI believes reasonable—or to pay a fee at all—is to pursue an expensive rate court litigation (the same is true for ASCAP under AFJ2).

36.    Interpretation of the BMI Consent Decree is overseen by the Hon. Louis L. Stanton.  Until recently, Judge Stanton also presided over all BMI rate cases.  The Orrin G. Hatch-Bob Goodlatte Music Modernization Act (the "MMA"), Pub. L. No. 115-264, 132 Stat. 3676 (Oct. 11, 2018) modified the assignment of rate court judges under the Consent Decree.  Now, rate court disputes are randomly assigned to a judge in the Southern District of New York, other than to the judges overseeing the BMI or ASCAP consent decrees or any judge presiding over a separate rate court proceeding.

B. **BMI and SiriusXM Licensing History**

37.    Sirius Satellite Radio Inc. and XM Satellite Radio Inc. began broadcasting in the early 2000s.  Since inception, satellite radio has been licensed by BMI.  To develop a rate for the new satellite radio service, BMI considered the prevailing rates for other potentially relevant comparable music uses, including commercial broadcast radio.  BMI also took into account the unique features of satellite radio and its music use, the emerging satellite radio market, and the high start-up and subscriber acquisition costs ("SAC") at the time.

38.    The initial satellite radio rate was set as a percentage of defined gross revenue, less certain permitted deductions, including SAC.

39.    When BMI negotiated that rate, satellite radio was nascent with two competitors vying for success—Sirius Satellite Radio Inc. and XM Satellite Radio Inc.  Each was licensed on an interim basis by BMI at the same initial satellite radio rate.

40.    In 2008, Sirius Satellite Radio Inc. and XM Satellite Radio Inc. merged to form SiriusXM.

41.    The first license between BMI and SiriusXM after the merger covered the period January 1, 2012 through December 31, 2017 (the "BMI/SiriusXM-12 License").

42.    The BMI/SiriusXM-12 License carried forward the previously-negotiated satellite radio rate.  The BMI/SiriusXM-12 License again allowed Sirius a number of deductions from gross revenues (to which the percentage-of-revenue rate was applied), including SAC, subject to a cap of no more than 20% of gross revenues.  The historical SAC deduction accounted for high subscriber acquisition and extraordinary start-up costs in the nascent satellite radio industry.

43.    The BMI/SiriusXM-12 License required SiriusXM to provide BMI with annual reports of its adjusted gross revenue for each calendar year covered by the license.  The

BMI/SiriusXM-12 License provided BMI the right to audit SiriusXM's books and records of account to verify the annual reports.

44.    The BMI/SiriusXM-12 License provided for arbitration of any disputes arising from the license and not subject to the jurisdiction of the rate court.

45.    In 2017, BMI's audits of SiriusXM revealed issues regarding SiriusXM's accounting and recording of its claimed deductions for the calendar years 2013, 2014 and 2015. For example, BMI disputed SiriusXM's characterization of revenue-share payments with car manufacturers and customer service costs as deductible SAC under the license.  BMI also disputed Sirius's exclusion of certain revenue streams from the revenue subject to fee.  BMI determined that these accounting issues had resulted in underpayment of SiriusXM's licensing fees under the BMI/SiriusXM-12 License.  On May 24, 2017, BMI notified SiriusXM of its findings and proposed adjustments to the prior payments.  SiriusXM disputed BMI's conclusions.

46.    Around the same time as the audit disputes, the parties were also in discussions about extending the terms of the BMI/SiriusXM-12 License.

47.    In 2019, BMI and SiriusXM agreed to a new license that would cover the period from 2018 through 2022 (the "BMI/SiriusXM-18 License").[7]  The parties also agreed to settle the audit disputes in exchange for a flat one-time payment by SiriusXM.

48.    To avoid similar disputes going forward, BMI and SiriusXM structured the BMI/SiriusXM-18 License as a flat-fee license under which SiriusXM paid an agreed-upon fee for each year, rather than adopting the historical percentage-of-revenue structure.  The flat-fee structure eliminated the need for revenue reporting and audits.

---

[7] In December 2022, BMI and SiriusXM agreed to an interim extension agreement through which the parties would continue to operate pursuant to the terms of the BMI/SiriusXM-18 License while negotiating new final license terms, with any fees paid to be adjusted retroactively when finally agreed or set by the Court.

49.     BMI negotiated a flat fee that it believed would approximate its projected fees under the established satellite percentage-of-revenue rate, assuming BMI's view of acceptable revenue deductions.  However, two notable changes since the signing of the BMI/SiriusXM-18 License—an unexpected increase in revenues and a decline in SAC—mean that BMI had been underpaid relative to what BMI expected (and to what BMI believes would be reasonable going forward).

### i.   SiriusXM's Financial Performance During the Term of the BMI/SiriusXM-18 License

50.     Relying on SiriusXM's representations that SiriusXM's revenues would remain relatively flat over the next five years, BMI agreed to small annual increases.  Although market analysts were projecting moderate growth during the period of the license, SiriusXM led BMI to believe that those projections were overstated and that growth would be lower than analysts' projections.

51.     After the parties agreed to the BMI/SiriusXM-18 License, SiriusXM's revenue rose and its subscriber acquisition costs fell, both to an extent that was not anticipated when the BMI/SiriusXM-18 License was negotiated.  SiriusXM's subscriber count also grew to all-time highs by the end of 2019, with subscriber revenue continuing to rise to date even as subscriber count has plateaued in recent years.

52.     As a result, the flat-fee structure resulted in licensing fees significantly below what the BMI/SiriusXM-12 License would have yielded, or what BMI would have agreed to had SiriusXM provided BMI with accurate growth projections.

### ii.   SiriusXM's Emerging Focus on Digital Offerings

53.     During the term of the BMI/SiriusXM-18 License and especially afterwards, SiriusXM began to significantly change its digital strategy in ways that were not taken into account when the BMI/SiriusXM-18 License was negotiated.  BMI reached agreement with SiriusXM on

the material terms of a new license in September 2018. BMI expected that SiriusXM's digital offerings would remain ancillary to SiriusXM's satellite service. The parties then proceeded to document the agreement in the BMI/SiriusXM-18 License, which was executed in December 2019.

54. Since at least 2009, SiriusXM had offered a companion digital service (available over the internet or on phone apps) that allowed subscribers to the traditional car-based SiriusXM service to listen to SiriusXM programming outside of the car. The parties' negotiations focused on SiriusXM's core satellite offerings, not its ancillary digital product.

55. In April 2019, however, six months after the parties had agreed to the terms of the BMI/SiriusXM-18 License, SiriusXM introduced a new streaming-only "Essential Plan" targeted at listeners using mobile phones, the internet, or other connected devices. SiriusXM touted the Essential Plan as an option that "makes it easier than ever to subscribe and listen without a car."[8] Also in 2019, SiriusXM announced it was expanding unlimited streaming access to 30 million subscribers at no additional cost. SiriusXM also launched "Personalized Stations Powered by Pandora," which enabled certain customers to create personalized stations based on an artist or song using the SXM App.

56. Sirius made no mention of the Essential Plan in its first quarter 2019 earnings release,[9] which was issued only three days after the announcement of the offering, or in its earnings

---

[8] *SiriusXM Introduces New Streaming Subscription Plan; Makes it Easier Than Ever to Subscribe and Listen without a Car* (April 22, 2019), https://investor.siriusxm.com/news-events/press-releases/detail/1062/siriusxm-introduces-new-streaming-subscription-plan-makes.

[9] *SiriusXM Reports First Quarter 2019 Results* (April 24, 2019), https://d1io3yog0oux5.cloudfront.net/_f45f45961c5416f1f46418f97e47a102/siriusxm/news/2019-04-24_SiriusXM_Reports_First_Quarter_2019_1058.pdf.

release for the second quarter of 2019[10] earnings release, the first quarter the Essential Plan was available to consumers.  It later became clear that these developments reflected a shift in SiriusXM's strategy to break into digital and expand its reach.

57.     As the BMI/SiriusXM-18 License approached expiration, SiriusXM's digital ambitions accelerated.  In January 2022, SiriusXM hired a new Chief Product & Technology Officer with an extensive background in digital streaming with the goal of expanding digital capabilities across SiriusXM's business.  That expansion goal has come to fruition.

58.     On November 8, 2023, SiriusXM announced a new version of the SXM App, which SiriusXM's CEO described as marking "a pivotal moment in our history, one that kicks off a new era of innovation at our Company."[11]  The SXM App became available to all SiriusXM subscribers beginning on December 14, 2023.[12] SiriusXM now tells its investors that its "vision is to shape the future of audio . . . both in terms of compelling content and the array of ways in which it can be consumed."[13]

59.     It is clear that Sirius views the SXM App a key part of that vision.  In a February 2024 earnings release it claimed it "laid the groundwork for future growth through the successful launch of our next-generation platform and the new SiriusXM app," and "made strategic content

---

[10]     *SiriusXM     Reports     Second     Quarter     2019     Results*     (July     30,     2019), https://d1io3yog0oux5.cloudfront.net/_f45f45961c5416f1f46418f97e47a102/siriusxm/news/2019-07-30_SiriusXM_Reports_Second_Quarter_2019_1029.pdf.

[11] *SiriusXM Unveils Next Generation Platform Bringing Fans Closer To What They Love* (Nov. 8, 2023), https://investor.siriusxm.com/news-events/press-releases/detail/2012/siriusxm-unveils-next-generation-platform-bringing-fans.

[12] SiriusXM 2023 Form10-K at 5 (Dec. 31, 2022).

[13] *Id.*

investments that expanded our reach to new listeners."[14]  In an April 30, 2024 earnings call, Sirius's CEO again emphasized the importance of the digital product: "At the end of last year, we launched the first step in a longer multi-phase journey deploying our new SiriusXM streaming app supported by a new digital infrastructure. We are confident this platform will enable us to innovate and deliver the best audio experiences, whether in car or on the go."[15]

60.    Indeed, SiriusXM advertises the SXM App as "the next generation of SiriusXM." The SXM App gives customers access to "exclusive content," including 200+ streaming-only music channels not available on satellite radio.  In a release announcing the launch of the new app, SiriusXM touted its use of music, including "additional features and functionality such as skips and a new pivot feature that presents listeners with alternative recommendations to quickly and easily jump into content better suited to their vibe."[16]  Citing surveys it conducted in 2021 and 2022, SiriusXM has said its customers attribute increasing value to its digital streaming offerings.

61.    BMI licenses digital music services like Spotify or Sirius-owned Pandora—whose products are similar to SiriusXM's streaming service—at a materially higher rate than the historical satellite radio rate on which the BMI/SiriusXM-18 License's flat fee was based.

---

[14] *SIRIUSXM Reports Fourth Quarter and Full-Year 2023 Operating and Financial Results* (Feb. 1, 2024), https://d1io3yog0oux5.cloudfront.net/_f45f45961c5416f1f46418f97e47a102/siriu sxm/db/2244/21439/earnings_release/SIRI+Q4+2023+Earnings+Release+-+FINAL%5B41%5D.pdf.

[15] *Sirius XM Holdings Inc. (SIRI) Q1 2024 Earnings Call Transcript* (April 30, 2024 11:28 ET), https://seekingalpha.com/article/4687521-sirius-xm-holdings-inc-siri-q1-2024-earnings-call-transcript.

[16] *The Next Generation of SiriusXM Begins: New App Starts Rolling Out Today* (December 14, 2023), https://investor.siriusxm.com/news-events/press-releases/detail/2023/the-next-generation-of-siriusxm-begins-new-app-starts.

### C. **SiriusXM Today**

62.     SiriusXM's financial performance, and its expansion of its digital offerings, make clear it is no longer a startup in a nascent industry.  It is a mature business that acquired its primary competitor, has solidified its place in the audio landscape, and has invested in and expanded its digital offerings, turning what was once just a satellite radio service into something broader.  In 2023 SiriusXM generated more than $6.8 billion in revenue and had nearly 32 million self-paying subscribers, along with another 1.9 million subscribers on promotional subscriptions.  As of May 1, 2024, Sirius had a market cap of more than $11 billion.

63.     Yet, despite achieving its secure and successful position, Sirius has continued to pay songwriters—who create the music essential to SiriusXM's business—at rates that are below those negotiated decades ago when satellite radio was an infant industry with an uncertain future. It is also paying licensing fees at lower rates than other large music users against which SiriusXM competes for listeners.  Accordingly, BMI's affiliated songwriters and composers, and their associated publishers, have been under-compensated relative to their importance to SiriusXM and its current market position.

64.     BMI has determined that a reasonable rate for the new license must account for material changes that have occurred since the parties negotiated the BMI/SiriusXM-18 License, including SiriusXM's strong financial performance, its growing emphasis on digital service offerings and its overall place in the music landscape.

### **The Rate Quote**

### A. **BMI's Rate Quote for the 2022-2026 License with SiriusXM**

65.     BMI sent SiriusXM the Rate Quote for a new blanket license on May 8, 2023 for the period January 1, 2022 through December 31, 2026.

66.     The issuance of the Rate Quote triggered a mandatory negotiating period under the Consent Decree.  If no agreement was reached after sixty days, SiriusXM could file a petition in this District seeking a ruling on the reasonable fees and terms for the requested license.  If no agreement was reached after ninety days, BMI could also initiate a proceeding.

67.     More than ninety days have passed since BMI issued the Rate Quote.  The parties have engaged in negotiations but have been unable to come to an agreement on fees and terms for a final license.

### B.   The Rate Court's Evaluation of Rate Quotes

68.     Pursuant to the Consent Decree, this Court must determine if the Rate Quote is reasonable.  To do so, the Court considers whether it reflects the fair market value of the requested license, meaning the price that a willing buyer and a willing seller would agree to in an arm's-length transaction.  Recognizing that there is likely not a single reasonable rate, the court must determine whether the quoted rate falls within the range of reasonable rates.  If the Court determines that the rate quoted by BMI is reasonable, the Court's inquiry stops, and the Rate Quote is adopted.  If, at the conclusion of this analysis, the Court determines that the Rate Quote is not reasonable, the Court must then set a reasonable rate based upon an evaluation of all the evidence.

### i.   PRO Benchmarks

69.     Rate courts look at many factors to determine if a rate is reasonable, including the licensee's business, use of music, and changes in the economic environment.  One common tool used to evaluate these factors are benchmark agreements, a category that may include BMI's past licenses, licenses entered into between the music user and other PROs or other comparable agreements, which are adjusted to make them as similar as possible to the requested license.  These comparable benchmark agreements are typically adjusted to account for market and business factors such as BMI's market share, on a weighted basis, of the music performed by SiriusXM.

70.     Rate courts also consider the context in which a benchmark license was negotiated. For example, rate courts examine whether benchmark licenses were influenced by factors that may distort the bargaining position of the parties, including whether negotiations took place in the "shadow of a rate court."   BMI's rate court has previously recognized that ASCAP and BMI agreements are constrained by the presence of the rate court and that the negotiating parties know (a) BMI cannot refuse to license the music user (thus reducing the leverage BMI might have in unregulated negotiations); (b) the only recourse to a standstill in negotiations is to proceed to rate court; and (c) a rate court will set a rate with reference to historical benchmark rates.   This introduces a degree of circularity into ASCAP and BMI negotiations.   Music users, including SiriusXM, routinely insist that BMI accept the rate to which they agreed with ASCAP, even if BMI believes it is below a reasonable rate.   BMI's only recourse in such instances is to either acquiesce—which can result in historical rates persisting even if they no longer reflect a reasonable market rate—or commence a rate court litigation.

71.     Rate court litigations are expensive and require significant PRO attention and resources to pursue.   As such, a PRO is only incentivized to engage in litigation when historic PRO rates have become materially misaligned with the value of that PRO's music, as is the case here. The rate court system also creates a free-rider problem, wherein ASCAP can agree to a license at a below-market rate knowing that, if BMI is dissatisfied with the rate and is successful in litigation, ASCAP will be able to use the newly-established rate in its next negotiation.   ASCAP could also include—and in the past has included—a "most-favored-nation" provision in its license designed to keep it at par with BMI, allowing it to obtain the upside of a BMI negotiation or rate court litigation without assuming the cost or risk.   This dynamic also has the effect of undercutting the

value of an ASCAP license as a benchmark for determining what a willing buyer and willing seller would agree in an arms-length negotiation.

   **ii. <u>Sound Recording Rates</u>**

72.    Prior to the enactment of the MMA, Section 114(i) of the Copyright Act prohibited PRO rate courts from considering fees paid for digital performances of sound recordings.  In October 2018, Section 114(i) was repealed because there was a concern "that songwriters have not been adequately compensated for their contributions" to musical works, and that "§ 114(i) prevent[ed] songwriters from introducing potentially relevant evidence in rate court proceedings."[17]  As a result, for the first time in a BMI rate proceeding, this Court can consider license rates paid by SiriusXM for the right to publicly perform sound recordings.[18]

73.    The sound recording rates may be particularly informative here.  In addition to demonstrating that songwriters are grossly undercompensated, they also reflect the need for a material increase in the historical rates.  In 2018, the Copyright Royalty Board ("<u>CRB</u>") set the satellite royalty rate to 15.5% of revenue for 2017-2022, in part based on evidence that SiriusXM subscribers value music over other content.  This was a significant increase from the first digital sound recording rate for satellite radio services of 6% set in 2007.  The MMA extended the period for which the 15.5% rate applies through 2027.

---

[17] Committee on the Judiciary Report, *Music Modernization Act*, Report 115-651, 115th Congress 2d Session (April 25, 2018), https://www.congress.gov/115/crpt/hrpt651/CRPT-115hrpt651.pdf

[18] The public performance right, which BMI licenses, covers the public performance of the underlying work (written music and lyrics), and the copyright is typically held by songwriters, composers, and music publishers.  Sound recordings are recordings of a performance of a work and are protected by a separate copyright, which is typically held by a record label.  SiriusXM must obtain a license for the public performance right in both the composition and in the sound recording to legally play a song.

### C.  **BMI's Rate Quote is Reasonable**

74.     BMI's Rate Quote is reasonable in light of, among other things, SiriusXM's financial growth and reduction in SAC, SiriusXM's new emphasis on its digital product, the inflationary environment changes in the market, and other relevant benchmarks that did not exist, or were not admissible, when the prior license agreements were negotiated.  The Rate Quote includes adjustments to the prior rates necessary to account for these changes.  Other PRO benchmark agreements would also have to be adjusted to account for BMI's significantly higher market share, as calculated on a share-adjusted, revenue- or audience-weighted basis.

75.     As discussed above, the BMI/SiriusXM-18 License was a flat-fee license under which SiriusXM paid fixed amounts in each of the license's five-year term.  In recurring negotiations between parties, flat fees in multi-year licenses may be evaluated at the end of the license period.  The next license rate will be set to account for changes in the licensee's business and the broader marketplace, including revenue growth, reduction in a licensee's start-up costs, inflation, changes in product offerings, and other relevant developments since the last license was negotiated.

76.     The prior fees require adjustment for reasons including, but not limited to, those set forth below.

77.     SiriusXM's Financial Performance.  The BMI/SiriusXM-18 License fees were premised on SiriusXM's representations that financial growth would be flat, or at best modest, over the term of the license.  SiriusXM's revenue grew more than anticipated.  The Rate Quote therefore resets the fees to realign them with SiriusXM's actual revenues since January 1, 2022 and reasonable projections.

78.     SiriusXM also significantly reduced its SAC during the term of the BMI/SiriusXM-18 License.  As a result, the revenue deduction accounted for the current license period should be eliminated, or at a minimum, substantially reduced in estimating reasonable fees.

79.     SiriusXM's Digital Services.  SiriusXM has expanded user access to digital streaming and offers free access to the SXM App with the vast majority of its subscription plans. Today, unlike in 2018, SiriusXM subscribers can sign up for several different kinds of streaming-only plans; and SiriusXM's streaming service offers access to over 200 additional music channels, exclusive video content that includes in-studio music performances, and additional functionality such as on-demand content, skips, a "pivot" recommendation feature, and options for the customer to customize their own ad-free music stations.  As a result of these changes, SiriusXM's business has shifted and is becoming more akin to a music streaming service than a traditional satellite radio or broadcast radio.  Digital music services pay higher rates to BMI than satellite radio, and the new SiriusXM rate should reflect this expansion of digital performances.

80.     Economic Changes.  BMI's Rate Quote represents a reasonable adjustment to prior rates in light of increased inflation in the U.S. economy.  By contrast with the inflation rate in 2012 of 2.07%, and the inflation rate in 2018 of 2.44%, in 2022, the inflation rate was 6.5%.

81.     Other PRO Licenses.  Both GMR and SESAC recently renegotiated their licenses with SiriusXM.  As PROs not subject to consent decrees, the GMR and SESAC licenses reflect the fair market value of a negotiated PRO license.  Upon information and belief, the fees paid to GMR and SESAC under their current licenses support BMI's Rate Quote.[19]

82.     Expansion of Potential Benchmarks.  The prior agreement was negotiated with the understanding of the parties that Section 114(i) of the Digital Millennium Copyright Act

---

[19] BMI lacks complete information about these licenses and will be better able to assess the benchmarks in this proceeding upon completion of both fact and expert discovery.

("DMCA") prohibited the BMI rate court from considering the higher rates paid for digital performances of sound recordings in setting a rate for a BMI license. In 2018, the MMA repealed section 114(i) of the DMCA, fundamentally changing the rate-setting landscape. The BMI rate court may now consider licensing fees paid for digital performances of sound recordings in setting a rate for SiriusXM.

83.    Changes in Other Relevant Benchmark Rates.  In addition to the changes in the satellite radio market discussed above, the rates in other potentially relevant benchmark agreements have increased materially since the BMI/SiriusXM-18 License was negotiated and further support the BMI Rate Quote.

84.    For at least the foregoing reasons, BMI's Rate Quote reflects a reasonable adjustment of the prior rate to account for changes in SiriusXM's business as well as changes in the economy and potentially relevant benchmarks.

### Relief Requested

WHEREFORE, BMI respectfully requests that the Court enter an Order:

A.    Confirming as reasonable the rates and terms proposed by BMI for a license granting SiriusXM the right of public performance of the works in the BMI Repertoire;

B.    Directing SiriusXM to pay such license fees, effective as of January 1, 2022 and continuing through December 31, 2026;

C.    Awarding pre-judgment interest on the difference between interim license fees paid to BMI and the final fees awarded by this Court; and

D.    For such other and further relief as the Court deems just and proper.

Dated:  September 12, 2024            MILBANK LLP
        New York, New York

                                     /s/ Scott A. Edelman
                                     Scott A. Edelman
                                     Atara Miller
                                     Andrew L. Porter
                                     55 Hudson Yards
                                     New York, New York 10001
                                     Telephone: 212-530-5000
                                     Facsimile: 212-530-5219
                                     Email: sedelman@milbank.com

                                     -and-

                                     Stuart Rosen
                                     Hope Lloyd
                                     Marion Burke
                                     7 World Trade Center
                                     250 Greenwich Street
                                     New York, New York 10007

                                     *Attorneys for Petitioner Broadcast Music, Inc.*