**Weil, Gotshal & Manges LLP**

767 Fifth Avenue  
New York, NY 10153-0119  
+1 212 310 8000 tel  
+1 212 310 8007 fax  

**Benjamin E. Marks**  
+1 (212) 310-8029  
benjamin.marks@weil.com

BY ECF

September 12, 2025

Hon. Katherine Polk Failla  
United States District Court  
Southern District of New York  
40 Foley Square, Room 618  
New York, NY 10007

      Re: *Broadcast Music, Inc. v. Sirius XM Radio LLC*, No: 1:24-cv-06896 (S.D.N.Y.)

Dear Judge Failla:

      Pursuant to Rule 2.C.ii. of this Court's Individual Rules of Practice in Civil Cases, we write on behalf of Respondent Sirius XM Radio LLC ("Sirius XM") in response to Petitioner Broadcast Music, Inc. ("BMI")'s request for a protective order precluding any discovery at all into its financial information.

      BMI and its principal rival and closest comparator, ASCAP, are performance rights organizations ("PROs") that together and in roughly equal proportion control the public performance rights of most of the music in the U.S. market. Songwriters affiliate with only one PRO at a time, so PRO repertoires do not overlap. Each PRO thus functions as a monopolist over its own exclusive catalog. And if a music user like Sirius XM wants to perform a broad range of songs, it has no choice but to obtain licenses from both PROs. For decades, both BMI and ASCAP have been subject to antitrust consent decrees designed to curb their market power. Under the consent decrees, if a PRO and a music user cannot agree on a license, the rate court sets reasonable terms based on what the user "would pay in a competitive market, taking into account the fact that [the PRO], as a monopolist, 'exercise[s] disproportionate power over the market for music rights.'" *United States v. ASCAP*, 627 F.3d 64, 76 (2d Cir. 2010) (quoting *United States v. BMI*, 426 F.3d 91, 96 (2d Cir. 2005) ("*Music Choice*")).

      In this proceeding, BMI asks the Court to impose a royalty rate that is far higher than BMI or ASCAP has ever secured from Sirius XM across decades of voluntary licenses, based on arguments regarding, *inter alia*, "inflationary environment changes" and "other changes in the economic environment." ECF 1 ¶¶ 69, 74. But BMI seeks to avoid producing documents in response to eight of Sirius XM's Requests for Production (the "Financial RFPs") necessary to test BMI's assertions and evaluate reasonable rates.[1] These narrowly-tailored requests target documents concerning whether BMI's demand for a massive rate hike reasonably reflects changes in the value of the service it provides (it does not) or instead reflects an attempt to leverage its monopoly power to extract supra-competitive fees above the value of the music rights and BMI's role in aggregating them. The Court should reject BMI's attempt to shield this information from discovery.

---

[1] *See* Mot. at 2 n.2 (citing ECF 44-1, Sirius XM's RFP Nos. 61–64, 71, & 77–79).

**Weil, Gotshal & Manges LLP**

September 12, 2025
Page 2

      While BMI propounded numerous requests related to Sirius XM's finances, and Sirius XM has already produced highly detailed financial information for every year dating back to 2017, BMI has refused to produce *any* information about its own revenues, expenses or profits at all. This complete refusal is unjustifiable under Federal Rule of Civil Procedure 26, which permits discovery of "any matter that bears on, or that reasonably could lead to other matter that could bear on any party's claim or defense." *Ekstein v. Polito Assocs. LLC*, 2022 WL 783000, at *3 (S.D.N.Y. Mar. 15, 2022) (citation omitted). To curtail discovery into relevant matters, the opposing party must show that it would be unreasonably cumulative or the burden outweighs likely benefits. *See FCX Solar, LLC v. FTC Solar, Inc.*, 2022 WL 3584946, at *2 (S.D.N.Y. Aug. 22, 2022). BMI's financial information is relevant to the value of its licenses in a competitive market, and BMI has provided no explanation of why producing the financial statements and documents "sufficient to show" the information requested would be burdensome or disproportionate to the needs of the case.[2] Nor could it. Such information therefore must be produced.

      Contrary to BMI's assertions, rate courts often consider the licensor's financial information in evaluating a reasonable royalty rate. As both the ASCAP and BMI rate courts have recognized, a reasonable royalty rate encompasses both (1) the value of the compositions included in the license, and (2) the value that BMI provides in aggregating the rights to those compositions—the latter of which relates directly to BMI's costs in administering its licenses. That is why, in *BMI v. DMX Inc.*, the Second Circuit held that the rates set by the district court "reasonably compensated ASCAP and BMI for their services" where the rates covered the PROs' "licensing and overhead costs," as well as "an appropriate valuation of the right to publicly perform the licensed musical work." 683 F.3d 32, 48 (2d Cir. 2012); *see also BMI v. Pandora Media, Inc.*, 140 F. Supp. 3d 267, 293 (S.D.N.Y. 2015) (license fee should "cover[] the additional costs of BMI to administer" the license). Such costs can only be gleaned from the PRO's "own records and the allocations that [the PRO] makes of expenses." *In re THP Capstar Acquisition Corp.*, 756 F. Supp. 2d 516, 548 (S.D.N.Y. 2010). BMI's financials thus inform whether BMI's proposed rate quote would reasonably compensate BMI for its licensing costs, or would increase profit margins far beyond that by leveraging its unquestioned monopoly power. Further, although rate courts often employ a benchmarking analysis, there is no basis to foreclose Sirius XM from discovery that could inform other means of evaluating reasonable rates, such as bargaining models that depend in part on licensor financial information. *See, e.g., Determination of Rates and Terms for Preexisting Subscription Services and Satellite Digital Audio Radio Services*, 83 Fed. Reg. 65210 (Dec. 19, 2018) (evaluating opportunity cost model and Nash bargaining approach). "After all, '[t]he opportunity of users of music rights to resort to the rate court whenever they apprehend that [the PRO's] market power may subject them to unreasonably high fees would have little meaning if that court were obliged to set a 'reasonable' fee solely or even primarily on the basis of the fees [the PRO] had successfully obtained from other users." *Capstar*, 756 F. Supp. 2d at 538 (quoting *ASCAP v. Showtime/The Movie Channel, Inc.*, 912 F.2d 563, 570 (2d Cir. 1990)).

      The Financial RFPs seek information concerning annual financial statements (RFP No. 61), BMI's revenues from various licensees (RFP No. 62), the expenses incurred by BMI administering its license to

---

[2] *See, e.g.,* ECF 44-3, 44-6. BMI claims to have produced other materials "potentially relevant" to the rate court evaluation, including prior licenses and negotiations with Sirius XM, and prior licenses and communications with several other licensees (but not internal valuation documents or analyses). Mot. at 2. BMI does *not* argue that these documents are duplicative of the financial information requested.

Sirius XM (RFP Nos. 63–64), and the amounts distributed to BMI's rightsholder affiliates versus amounts retained by BMI and how that has changed since the parties last entered into a voluntary agreement (RFP Nos. 71, 77–79). These requests directly relate to the value of BMI's services and how BMI would license its repertoire in a competitive market, where prices tend towards costs.[3] They also relate to changes in "the economic circumstances affecting the earlier negotiators and the current litigants," which rate courts must consider in accepting and adjusting benchmarks. *Music Choice*, 426 F.3d at 95.

According to BMI itself, the amounts distributed to affiliates is relevant to the value of the compositions included in its license. *See, e.g.*, ECF 1 ¶ 7 ("BMI . . . distribute[s] license fees collected . . . to its Affiliates as royalties, *ensuring that they are fairly compensated for their public performance of their works*." (emphasis added)). BMI cannot at the same time refuse to provide discovery that would provide insight into the compensation its affiliates accept. The Financial RFPs thus also seek the amount of Sirius XM royalties retained by BMI instead of being paid out to its affiliates, and how that has changed with the shift in BMI's business model (RFP Nos. 71, 77–79). BMI's decision to retain a greater share of license fees after transitioning to a for-profit corporation (*see* ECF 30 ¶ 21) demonstrates either that BMI intends to take a larger cut from its affiliates—which would indicate that the value of the compositions has *decreased*—or that BMI intends to maintain payments to songwriters and instead extract the additional profit from licensees absent any increase in the market value of the music rights conveyed by the license. The latter is in turn attributable either to an increase in BMI's administration costs and the value of its aggregation services, or an exercise of market power to line its own pockets. Sirius XM is entitled to discovery as to whether and how the value of the compositions covered by BMI's license has increased or decreased, whether and how BMI's administrative costs have increased or decreased, and how those two aspects relate to one another, as well as to BMI's quoted fee.

Contrary to BMI's contention, *see* Mot. at 3, the decision in the Radio Music License Committee ("RMLC")'s suit against BMI only confirms that BMI's financial information is relevant here. First, that decision exclusively addressed requests related to BMI's change in business model and sale, whereas only one of the eight Financial RFPs even arguably relates to those topics. *See RMLC v. BMI*, 347 F.R.D. 269, 272 (S.D.N.Y. 2024). Second, RMLC did not argue, and Magistrate Judge Aaron thus did not consider, the relevance of the information sought to the relative values of the music rights licensed and the services BMI provides in aggregating those rights. *See id.* at 273. And, finally, Magistrate Judge Aaron agreed that a rate court must "consider, in the context of any benchmarking analysis, . . . the economic circumstances affecting the earlier negotiators and the current litigants." *Id.* at 273 n.7 (citing *Music Choice*, 426 F.3d at 95). He did not require BMI to produce information regarding its change in business model to RMLC because that shift "did not occur until" long *after* BMI's rate quote to RMLC. *Id.* at 273 & n.7. Here, by contrast, BMI's change to a for-profit business model occurred *before* its rate quote to Sirius XM, and potentially concurrently with BMI's initial conversations with its private equity buyer, thereby affecting the economic circumstances of the negotiators.

For the foregoing reasons, BMI's motion for a protective order should be denied, and BMI should be compelled to provide responsive discovery to RFP Nos. 61–64, 71, and 77–79.

---

[3] *See* Areeda & Hovenkamp, *Antitrust Law* § 501 (5th ed. 2025) ("[T]he substantial market power that concerns antitrust law arises when the [seller] . . . can profitably set prices well above its costs.").

**Weil, Gotshal & Manges LLP**

September 12, 2025
Page 4

                Sincerely,

                <u>/s/ *Benjamin E. Marks*</u>
                Benjamin E. Marks

cc: All counsel of record (via ECF)