**Weil, Gotshal & Manges LLP**

BY ECF

767 Fifth Avenue
New York, NY 10153-0119
+1 212 310 8000 tel
+1 212 310 8007 fax

**Benjamin E. Marks**
+1 (212) 310-8029
benjamin.marks@weil.com

September 12, 2025

Hon. Katherine Polk Failla
United States District Court
Southern District of New York
49 Foley Square, Room 2103
New York, NY 10007



Re: *Broadcast Music, Inc. v. Sirius XM Radio LLC*, No: 1:24-cv-06896 (S.D.N.Y.)

Dear Judge Failla:

    We write on behalf of Respondent Sirius XM Radio LLC ("Sirius XM") to request a discovery conference in accordance with Rule 2.C.ii of this Court's Individual Rules of Practice in Civil Cases. Sirius XM seeks an order compelling Petitioner Broadcast Music, Inc. ("BMI") to produce (1) documents concerning BMI's licensing agreement(s) with YouTube,[1] including the agreements themselves and communications concerning the negotiations of those agreements; and (2) BMI's internal valuation documents, analyses, and communications regarding its license negotiations with Amazon, Apple, Pandora, Spotify, and YouTube (collectively, the "Streaming Services").

    As acknowledged by BMI in its Letter Motion for a Protective Order, ECF 44 ("BMI's Letter Motion"), to determine a reasonable rate for a performing rights license, "rate courts typically employ a benchmarking analysis, whereby the court considers whether the quoted rate falls within the range of rates indicated by market transactions for similar rights between similar parties, as adjusted to make them comparable to the requested license."  ECF 44 at 2 (quoting *United States v. Broad. Music, Inc.* (*Music Choice IV*), 426 F.3d 91, 95 (2d Cir. 2005)).  In its Petition, BMI expressly referred to rates paid by "digital music services like Spotify or Sirius-owned Pandora" as a point of comparison for the satellite radio rate at issue here.  ECF 1 ¶ 61; *see also id* ¶ 79.  While Sirius XM considers its prior voluntary licenses with BMI and past and present licenses with ASCAP as far more probative of a reasonable fee for the license at issue, it is plainly entitled to adequate discovery into BMI's negotiations with digital music services, BMI's internal valuations of reasonable fees for those licensees, and the agreements that have emerged from those negotiations.  While BMI has agreed to produce its agreements with a limited subset of digital music services and *external* negotiations with that subset of services, the parties are at impasse with respect to the subject matter of this letter motion, both of which are plainly discoverable.

---

[1] BMI disclosed that it has a single license agreement that covers both YouTube Music and YouTube's audiovisual platform ("YouTube A/V," and collectively with YouTube Music, "YouTube"). *See* Ex. E at 6.

**Weil, Gotshal & Manges LLP**

September 12, 2025
Page 2

### BMI's Agreements with YouTube and Documents Concerning Negotiation of Those Agreements

In order to respond to BMI's potential use of its agreements with music streaming services as benchmarks for the license, Sirius XM requested the production of basic information related to those agreements, including the agreements themselves, documents concerning negotiations of those agreements, documents concerning BMI's share of performances by those licensees, and BMI's consideration of the extent of non-music content (if any) offered on those services.  *See* Ex. A, RFP Nos. 41-45, 51-54, 58, and 65.[2]  In response to BMI's objections that the number of different streaming services it has licensed made those requests unduly burdensome (among other objections), *see* Ex. B, Sirius XM agreed to narrow its requests to five leading services:  Spotify, Apple Music, Amazon, Pandora and YouTube.  While BMI, after multiple meet-and-confers, agreed to produce agreements and *external* communications with Spotify, Apple Music, Amazon, and Pandora related to the negotiation of those agreements, it has refused to produce anything at all with respect to YouTube.  *See* Ex. E at 5–6.  Sirius XM respectfully submits that the Court should not countenance this type of cherry-picking given the standards for discoverability under Federal Rule of Civil Procedure 26.

Numerous sources have identified YouTube as a leading source for the consumption of music in the U.S.  *See, e.g.*, Jean-Samuel Beuscart, *et al.*, "Listening to music videos on YouTube. Digital consumption practices and the environmental impact of streaming," Journal of Consumer Culture, 0(0), Oct. 13, 2022, at 1 ("YouTube is currently the most widely used platform for music streaming"); Stuart Dredge, "Surprise! YouTube is the most popular music streaming service," Music Ally (Mar. 22, 2021), https://musically.com/2021/03/22/surprise-youtube-is-the-most-popular-music-streaming-service/.  In addition to offering an audio-visual streaming service that is widely used to stream music, YouTube also offers YouTube Music, a music-specific streaming service available to consumers on either an ad-supported or a subscription basis.  YouTube Music now has in excess of 125 million paid subscribers.[3] BMI has attempted to dispute the relevance of its agreement(s) with YouTube on the ground that they cover both YouTube Music and the broader YouTube audio-visual service,[4] but that broader service is itself an immensely popular destination for music listening, and the fact that it offers significant non-music content as well only makes it, if anything, a closer analog to Sirius XM than streaming services like Apple Music or Spotify, which are much more heavily focused on music content alone.  *See* ECF 30 ¶¶ 6, 10, 12, 15 (describing Sirius XM's extensive non-music content).  There is simply no basis to allege, as BMI has, that its agreements with digital music services may be relevant points of comparison for fee-setting here, but then deny Sirius XM any discovery at all into BMI's license relationship with the most popular source for music consumption in the country.

---

[2] In accordance with Local Civil Rule 37.1, the Appendix includes verbatim Sirius XM's requests at issue and BMI's objections.

[3] Murray Stassen, YouTube Music hits 125 million subscribers, adding 2M subs per month on average over the past year, Music Business Worldwide (March 5, 2025), https://www.musicbusinessworldwide.com/youtube-music-hits-125m-paid-subscribers-adding-2m-subs-per-month-on-average-over-the-past-year/.

[4] *See* Ex. E at 5–6.

**Weil, Gotshal & Manges LLP**

September 12, 2025
Page 3

### BMI's Internal Documents Concerning License Negotiations with the Streaming Services

BMI also refuses to produce any of BMI's internal valuation documents, analyses, and communications regarding its license negotiations with the Streaming Services, *see* Ex. E at 5–6, but there is no reasonable basis to withhold those either.

In *Music Choice IV*, the Second Circuit laid out the factors courts should consider when choosing and evaluating "appropriate benchmarks," including (1) the "'degree of comparability of the negotiating parties to the parties contending in the rate proceeding,'" (2) "'the comparability of the rights in question,'" (3) the "'similarity of the economic circumstances affecting the earlier negotiators and the current litigants,'" and (4) the "'degree to which the assertedly analogous market [] reflects an adequate degree of competition to justify reliance on agreements that it has spawned.'" *Music Choice IV*, 426 F.3d at 95 (internal citations omitted). The Second Circuit emphasized that choosing an appropriate benchmark required investigating the negotiations surrounding the agreement to determine "whether the idiosyncratic circumstances distorted the negotiation." *Id.* at 94. BMI's internal analyses conducted in connection with license negotiations with the Streaming Services and related communications about rates and rate structures it would be willing to accept from them are just as likely, if not more so, to be informative on these issues than BMI's external communications with those services. *See, e.g.*, *In re THP Capstar Acquisition Corp.*, 756 F. Supp. 2d 516, 524 n.12 (S.D.N.Y. 2010) (considering "internal ASCAP documents and ASCAP's negotiation strategy" when determining reasonable rate). Internal documents will shed light on how BMI itself valued the rights at issue and what it was willing to accept for them (versus what it demanded or was able to achieve in the negotiations), which arguments BMI considered persuasive and which it did not, which factors it considered more relevant than others, and the extent to which internal expectations or analyses influenced BMI's willingness to agree to a particular rate. *See id.* Without access to BMI's internal communications and analyses, Sirius XM would be limited to evaluating benchmarks BMI has signaled that it intends to offer only on the basis of whatever negotiating posturing the parties' exchanged, rather than the analyses and valuations on which actually BMI relied in entering into those agreements, and would be unfairly prejudiced in its ability to cross-examine BMI witnesses testifying about why BMI did or did not agree to particular rates and terms. *See, e.g., id.* at 524 n. 12 (finding ASCAP witness testimony concerning proposed benchmark not credible because "internal ASCAP documents . . . tell a different story").

BMI is left to contend that the collection and review of such documents would be unduly burdensome or disproportionate to the needs of the Action, but the Court should have a full record with respect to benchmark agreements that BMI may offer, and BMI should not be held to a lesser standard with respect to discovery obligations in a proceeding it commenced than the standards imposed on Sirius XM. In the requests BMI propounded to Sirius XM, BMI sought the production of Sirius XM's internal communications concerning negotiations with other licensors—a burden Sirius XM undertook[5]—and there is no basis for different standards to apply to BMI's own obligations to search for and produce documents.

---

[5] Using search terms negotiated with BMI, Sirius XM reviewed more than 70,000 documents and has produced substantially more documents to date than BMI has.

**Weil, Gotshal & Manges LLP**

September 12, 2025
Page 4

                                     Sincerely,

                                      /s/ *Benjamin E. Marks*
                                     Benjamin E. Marks

cc: All counsel of record (via ECF)

```
The Court has reviewed Petitioner's letter motion for a conference
seeking a protective order (Dkt. #44), Respondent's response in
opposition to Petitioner's letter motion (Dkt. #45), and Respondent's
above letter motion for a conference seeking a motion to compel (Dkt.
#46).  The parties' motions for a conference are GRANTED.

The parties are hereby ORDERED to appear for a conference to discuss
their anticipated motions on October 14, 2025, at 11:00 a.m. in
Courtroom 618 of the Thurgood Marshall Courthouse, 40 Foley Square, New
York, New York.

The Clerk of Court is directed to terminate the pending motions at
docket entries 44 and 46.

Dated:     September 17, 2025         SO ORDERED.
           New York, New York
```

*[signature: Katherine Polk Failla]*

HON. KATHERINE POLK FAILLA
UNITED STATES DISTRICT JUDGE